LISA BORODKIN, ATTORNEY AT LAW
LISA J. BORODKIN, ESQ., STATE BAR NO. 196412
LISA@LISABORODKIN.COM
2009 CLARK LANE B
REDONDO BEACH, CALIFORNIA 90278
TELEPHONE: (323) 337-7933

KING, HOLMES, PATERNO & SORIANO, LLP
HOWARD E. KING, ESQ., STATE BAR NO. 77012
KING@KHPSLAW.COM
1900 AVENUE OF THE STARS, 25TH FLOOR
LOS ANGELES, CALIFORNIA 90067-4506
TELEPHONE: (310) 282-8989
FACSIMILE:  (310) 282-8903

Attorneys for Plaintiff
ELINOR SHAPIRO

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| ELINOR SHAPIRO,<br><br>                    Plaintiff,<br><br>          vs.<br><br>HASBRO INC. and DOES 1 through 10, inclusive,<br><br>                    Defendants. | CASE NO. 2:16-cv-05750<br><br>**COMPLAINT FOR:**<br><br>(1) Misappropriation of Trade Secrets Under 18 U.S.C. § 1836<br><br>(2) Misappropriation of Trade Secrets Under Cal. Civ. Code § 3426.1 *et seq.*<br><br>(3) Breach of Express Written Contract<br><br>(4) Breach of the Implied Covenant of Good Faith and Fair Dealing<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Elinor Shapiro ("Shapiro") alleges as follows:

## I.

## JURISDICTION AND VENUE

1.       This Court has jurisdiction of the subject matter of this action under federal question jurisdiction, pursuant to 28 U.S.C. § 1331 and 1338(a), because this action includes a claim arising under the 18 U.S.C. § 1836, the Defend Trade

1  Secrets Act ("DTSA"), for misappropriation of trade secret information intended for
2  use in interstate and foreign commerce.

3       2.     This Court has supplemental jurisdiction over Plaintiffs' state law
4  claims pursuant to 28 U.S.C. § 1367 and 28 U.S.C. §§ 1332(a)(1) because the action
5  includes claims between a citizen of the State of California and a citizen of the State
6  of Rhode Island, and the amount in controversy exceeds, exclusive of interest and
7  costs, the sum of Seventy-Five Thousand Dollars ($75,000.00).

8       3.     Venue is proper in this judicial district pursuant to 28 U.S.C. §
9  1391(b)(2) and (d) in that Defendant or its agents may be found in this district, and a
10  substantial number of the acts or omissions giving rise to Plaintiff's claim occurred
11  in this district.

12  **II.**

13  **NATURE OF THIS ACTION**

14       4.     Shapiro, a proven doll inventor and marketing expert known for her
15  work on Barbie and Disney fashion dolls, was solicited by Defendant Hasbro, Inc.
16  ("Hasbro") to submit original materials for use with Hasbro's existing properties
17  under an express Agreement to Hold Confidential ("AHC").

18       5.     Hasbro initiated Shapiro's submission by a November 2, 2012 email
19  that described in detail the types of information Hasbro was seeking with phrases
20  such as "excitement, low cost innovations," "never before seen mechanisms," "new
21  ways to play," and "newest and hottest girls trend" specifically in reference to
22  Hasbro's existing properties including Littlest Pet Shop and My Little Pony.

23       6.     Hasbro received Shapiro's submissions in confidence at an April 25,
24  2013 meeting in Santa Monica, California that Hasbro arranged as part of its West
25  Coast Inventor Tour. Hasbro thereafter asked Shapiro to send her slideshow and
26  three-dimensional prototypes to its headquarters in Pawtucket, Rhode Island to
27  study for three months with broad distribution to its product development teams.

LISA BORODKIN
ATTORNEY AT
LAW
28

7.      Hasbro thereafter took confidential information that Shapiro presented under the AHC and used it without compensating Shapiro.

8.      Despite this, Hasbro does not want to pay Shapiro for the trade secret information it took under the AHC.

### III.

### THE PARTIES

9.      Shapiro is a professional toy inventor, and marketing consultant with 28 years of experience. She has worked at Mattel, Inc. ("Mattel") and on the Disney fashion dolls now known as Disney Princess. Shapiro is a citizen of the State of California, with her principal place of business in Los Angeles, California.

10.     Defendant Hasbro is a company organized and existing under the laws of Rhode Island, and a citizen of the State of Rhode Island with its principal place of business in Pawtucket, Rhode Island, with a registered agent for service of process in California at 818 West Seventh Street, 2nd Floor, Los Angeles, California 90017.

11.     Shapiro is informed and believes and thereupon alleges that Rhode Island is where Hasbro's home office is located, where the majority of its executive and administrative functions are performed, and where its high-level officers direct, control, and coordinate the bulk of Hasbro's day-to-day activities.

12.     Hasbro is subject to the general and specific jurisdiction of this Court pursuant to California Code of Civil Procedure § 410.10 and Rule 4 of the Federal Rules of Civil Procedure. Hasbro transacts or has transacted business within the Central District of California including through a Burbank business unit.

13.     Shapiro is informed and believes and thereupon alleges that Hasbro has systematic and continuous contacts with California, including by soliciting and receiving orders from stores with locations in California, including Target Corporation, Toys "R" Us, Inc., and Wal-Mart Stores, Inc., and maintaining a business unit in Burbank, California that employs citizens of this District.

LISA BORODKIN
ATTORNEY AT
LAW

3

14.     Hasbro is subject to the specific jurisdiction of this Court, including in that a substantial number of the transactions and occurrences in this action occurred in California. Hasbro first received the confidential information under the AHC in Santa Monica, California. Hasbro requested that Shapiro send the submission from Los Angeles, California to Pawtucket, Rhode Island. Hasbro breached the AHC in Los Angeles, California, including by attempting to sell toys misappropriating Shapiro's trade secrets in this District.

## IV.

## FACTS COMMON TO ALL CLAIMS

15.     The Doll business is a $2 Billion worldwide annual market.

16.     Doll lines are highly differentiated by size, price point and play value in a saturated market.  A key strategy for toy manufacturers is their ability to foresee demand trends for certain products in order to avoid over or undersupply issues.

17.     In turn, a key strategy is to know what has been done in the doll business before and what has never been done for consumers - knowledge that is possible only with decades of full immersion in the doll business.

18.     Shapiro has worked in the toy industry since 1988. She specializes in inventing toy concepts, and consulting on marketing and packaging toys for girls.

19.     Shapiro has worked on iconic doll lines including the Cabbage Patch Kids, Barbie, Polly Pocket, Disney Princess, Disney Fairies, and Tinker Bell.

20.     Shapiro worked at Mattel as a marketing executive from 1988 to 1995 managing multi-million-dollar doll lines.

21.     Shapiro worked at Walt Disney Company from 1995 to 1997, optimizing video game play for girls.

22.     Shapiro has been a consultant since 1998 on how to create, market, and design toys to girls.

23.     Shapiro's consulting clients include Mattel, The Walt Disney

LISA BORODKIN
ATTORNEY AT
LAW

4

COMPLAINT AND DEMAND FOR JURY TRIAL

1   Company, MGA Entertainment Inc., the Jim Henson Company, Playmates Toys,

2   Inc., JAKKS Pacific, Inc., Nakajima USA, Inc., Activision Blizzard, Inc., Wild

3   Planet Toys, Inc., Diggin Active, Inc., and Shains.

4       24.    Shapiro's consulting work includes focus group research, designing

5   packaging, working with product development and marketing teams, identifying

6   business opportunities, spotting trends, and consulting on how dolls should be

7   presented at retail.

8       25.    Shapiro has been creating integrated toy concepts, marketing and

9   packaging proposals for license and direct manufacture since 2001.

10      26.    In 2001, Shapiro entered into a benchmark invention license with

11  Mattel for an original small doll line, sold at retailers under the name "Little

12  Sparklin' Clouds."

13      27.    Shapiro negotiated with Mattel for a packaging credit and packaging

14  logo on the Little Sparklin' Clouds box for her inventor group by giving up one

15  royalty point from the traditional inventor royalty. Shapiro did so, because the

16  unquantifiable fame as a successful girls' toys inventor that a packaging credit and

17  logo confirms is immeasurably more valuable than an additional royalty point.

18      28.    The packaging credit Shapiro negotiated in her 2001 Mattel license was

19  printed on the toy box, and read "Product Manufactured under license from Golden

20  Kids Toys & Entertainment" with a "GK toys" logo.

21      29.    Shapiro traded a 1-point royalty for a credit because of the

22  unquantifiable benefit of reputation and fame in the extremely competitive doll

23  business.

24      30.    Having a package credit, with a line selling at stores, means an inventor

25  is viewed within the doll business as having insight into how girls play, with a

26  successful inventing track record, which in turn means more meetings, more fame,

27  and more personal satisfaction and fulfillment in achieving the ultimate goal of

LISA BORODKIN
ATTORNEY AT
LAW

28

COMPLAINT AND DEMAND FOR JURY TRIAL

1  being a world-famous doll inventor.

2  <center>V.</center>

3  <center>**PLAINTIFF'S TRADE SECRETS**</center>

4      31.    Shapiro identified a unique business opportunity in girls dolls and

5  created in or around 2012 an original line of animal-shaped small dolls named

6  "Wishables" incorporating, *inter alia,* an opening price point line of $5.99-$7.99

7  totally clear, animal-shaped, liquid-and-uniquely-shaped-glitter filled characters

8  ("Phase 1") and a deluxe line with totally clear, animal-shaped dolls with a light-up

9  feature for a $9.99-$10.99 price point with a marketing strategy showing how the

10  line could be extended and sold for years to come.

11      32.    Shapiro's information in her original slideshow presentation, sculptural

12  prototypes, and in-person demonstration, together with all information contained

13  therein, including but not limited to marketing opportunity, marketing strategy,

14  "total look and feel," concept, design, features, focus group research, news stories,

15  trend analysis, marketing mock-ups, packaging, testimonials, proposed integration

16  with Hasbro's existing properties, Hello Kitty and Littlest Pet Shop models, and

17  proposals for line and product extensions for years to come is a compilation trade

18  secret referred to collectively as the "Wishables Submission."

19      33.    Shapiro owned a trade secret in a marketing opportunity, namely that a

20  totally clear, animal-shaped doll line with a light-up feature had never been done in

21  the $9.99-$10.99 price slot for girls (particularly as a Deluxe version or follow-up

22  line extension to an opening price point line of totally clear, animal-shaped dolls

23  with glitter in liquid, where the glitter was shaped to match each character's special

24  symbol at the $5.99-$7.99 price slot for girls).

25      34.    In addition, Shapiro owned a combination trade secret in the previously

26  unknown combination of (1) a line of totally clear, animal-shaped bodies, (2) where

27  the playable or sellable feature is that the totally clear body would light up and look

LISA BORODKIN
ATTORNEY AT
LAW

28

<center>6</center>
<center>COMPLAINT AND DEMAND FOR JURY TRIAL</center>

beautiful when lit up, and (3) that it could be executed and compete successfully at the $9.99-$10.99 price slot, particularly as a deluxe version or follow-up line extension to an opening price point line of (1) totally clear, animal-shaped dolls (2) filled with liquid-and-character-themed glitter where (3) each character had glitter in a different collectible shape, at the $5.99-$7.99 price slot.

35.     Even if one or more of the foregoing elements were previously known, the elements in combination was previously unknown, and had tremendous potential value from not being generally known. No doll line at that price slot had ever been based around those elements, prior to Shapiro's development of the information and strategy in the total Wishables Submission.

36.     Shapiro took all reasonable precautions to keep the Wishables Submission confidential, maintained materials related to the Wishables Submissions in password-protected computers and secure physical locations at all times, and required recipients of the information to sign non-disclosure agreements every time that she presented them, beginning on or about June 11, 2012.

37.     Shapiro's Wishables Submission was a confidential compilation of trade secret information that included, but was not limited to:

        a.     A marketing road map with "Phase 1" - an opening price point of $5.99-$7.99 of small dolls in different, collectible, animal characters where the doll had (1) a totally clear body, (2) filled with liquid and glitter, and (3) each character in the line would have glitter shaped in a specific symbol associated with the character's personality;

        b.     Pictures and mock-ups of the packaging for the line;

        c.     Hand-made physical models modeling the effect of translucent, animal-shaped characters filled with liquid in glitter, with different shaped glitter representing the different symbols for Phase 1, as more fully explained in the slideshow;

d.      Hand-made physical models applying the invention to Hello Kitty and Littlest Pet Shop;

e.      Focus group research from girls in 2012 and 2013 testing the hand-made models on girls, A/B testing against another brand, collecting comments and impressions from the girls, a form of research recognized as valid in the doll business;

f.      Trend analysis in the form of data points from different media sources indicating that snow globes were predicted as a new and hot trend in later 2012, a form of research recognized as valid in the doll busines;

g.      A working model of the totally clear, light-up deluxe $9.99-$10.99 version, complete with packaging, and working light-up mechanism that could be costed and executed within the price point;

h.      Drawings and proposals for a deluxe play set featuring a slide and other elements in combination;

i.      The marketing rationale and "reasons why" the line with the unique combination of design elements had never been done before as a collectible line for girls in that price slot;

j.      Strategic information about the proper price slots, timing, presentation, packaging and execution of the line, communicating that each price point in the line would be cost-feasible and competitive with other products at those price slots;

k.      A slideshow showing a total "look and feel" for a girls' line with colors, graphics, copy and branding showing insight into how girls play

l.      In-person demonstration of the slideshow and models; and

m.      the successful and valuable integration of all the foregoing elements.

38.      Shapiro developed the foregoing components completely in secret,

LISA BORODKIN
ATTORNEY AT
LAW

COMPLAINT AND DEMAND FOR JURY TRIAL

sculpting and casting different animal characters, with a translucent, colored resin, decorating the eyes and applying hand-selected glitter, and using a cheap but working lighting device to light the clear animal body for the $9.99-$10.99 deluxe model.

39.     Shapiro developed in secret a packaging mockup with graphics on all sides and a windowed front to realistically simulate the item's appearance at retail.

40.     Shapiro developed in secret a Hello Kitty model to show that Wishable could be use to drive new sales of existing brands, and a Littlest Pet Shop model expressly for the April 25, 3013 meeting with Hasbro, to show that Wishables could be used with Hasbro's existing brands, as Littlest Pet Shop is one of Hasbro's girls brands.

41.     Shapiro developed the slideshow completely in secret, storing it and its digital assets on a password-protected computer and in a password-protected account.

42.     Shapiro invested more than 650 hours of work of the type for which is regularly paid by Hasbro's largest competitors to develop the information in the Wishables Submission.

43.     The information had value from not being known, and was valuable to the recipient, Hasbro, as a "new way to play" using a "low-cost innovation" and the "newest and hottest girls trends" as Hasbro competes with other toy manufacturers and independent toy designers for ideas for making toys.

## VI.

## CUSTOM AND PRACTICE IN TOY INVENTION

44.     Toy companies compete with each other and with independent toy designers for ideas and concepts that can be feasibly manufactured and sold at an acceptable profit margin.

45.     Every year, Toy companies compete for the best new ideas and

LISA BORODKIN
ATTORNEY AT
LAW

9

concepts from these independent toy designers to use with their existing brands, so that they can mitigate the risk of over-supply and under-supply, meet their overall financial sales projections, and expand to new markets and segments.

46.     Toy companies will have inventor meetings only with established toy inventors, and the course of dealing follows well-understood customs and rule.

47.     Both parties expect to sign a two-way non-disclosure agreement before the inventor discloses his or her ideas.

48.     Both parties expect that the invention will be considered for a particular group (Boys, Girls, Activity, Games, etc.)

49.     Both parties expect that the toy company will use dedicated concept acquisition personnel to do the initial vetting of the inventor's ideas.

50.     Both parties expect that the concept acquisition person may prepare the inventor with a "wish list" of needs the relevant group has for the upcoming seasons, given that the typical toy development timeline is 15-18 months.

51.     Both parties expect that the toy company's concept acquisition person will be aware of the toy company's products in development and particular needs in the relevant group (Girls, Boys, Activity, Action, Games, etc.).

52.     Both parties expect that the toy company's acquisition person will stop the inventor's presentation and put "on record" at the earliest possible time if the inventor's idea overlaps with a product the toy company already is developing "in house."

53.     Both parties expect that if the toy company stops the presentation and discloses that the idea is already "in house," the toy company will not hold or take in the inventor's materials, and the inventor will go on to present the next idea.

54.     Both parties expect the concept acquisition person will fill out a pre-printed Inventor Review Record or the equivalent, documenting the idea the inventor has shown, and the disposition - (Pass, Hold/Send in, Inventor to Do More

1  Work, or In House), and that the parties will sign the agreed statement of what ideas
2  were shown and the disposition.

3      55.    Both parties expect that the toy company's concept acquisition person
4  will limit exposure of the inventor's idea to a "need to know" basis, because the toy
5  product develop process is very fluid, and both parties take steps to avoid "tainting"
6  the internal product development process with outside ideas unless the concept
7  acquisition person determines that the idea is not already "in-house."

8      56.    Both parties expect that if the concept acquisition person "holds" or
9  asks to "send in" the inventor's materials, the idea is not already "in house."

10     57.    Both parties expect that if the toy company holds the inventor's
11 materials for more than 2 or 3 months, the toy company will pay an option fee to
12 continue holding the inventor's materials as the toy company considers whether it
13 can manufacture the toy.

14     58.    Both parties expect that if the toy company holds the inventor's
15 materials for 2 or 3 months and "passes" on the idea, a reason is usually given to the
16 inventor, which can be as general as "not the right fit."

17     59.    Both parties expect that the longer a company holds an inventor's
18 materials, the more likely it is that the toy company and inventor will enter into a
19 license agreement.

20     60.    Both parties expect that the license agreement consists of an advance
21 and a royalty, with five percent (5%) being the norm if no outside license is
22 required, and three percent (3%) being the norm if an outside license is required
23 (i.e.,  the invention will only work with a particular licensed character, such as
24 Spongebob Squarepants, Marvel).

25     61.    Simultaneous "independent creation" by the same designers who have
26 seen the outside inventor's materials is not possible in the toy business. Toy
27 designers get inspiration from everything in the outer an inner world, in the present

LISA BORODKIN
ATTORNEY AT
LAW

28

COMPLAINT AND DEMAND FOR JURY TRIAL

1  and in memory, in reality and in dreams, in conscious and unconscious ways -- once
2  an idea is seen, it cannot be "unseen." There is no way to separate what came from
3  where, or to prove the product teams would have thought of it anyway

4      62.     As Alfred Vuono, co-developer of the original My Little Pony and the
5  Kindle, testified:

6
7          "The process of taking a concept and making a product is like making a
           solution in a lab. You can't dip a stirring rod that was used in something
8          else in it and have it come out the same."

9      63.     Former Hasbro toy concept acquisition head Wayne Luther testified
10  that the situation where a toy company would settle with an outside inventor is when
11  product teams have seen an outside invention that is the same thing they are doing,
12  but do not remember that they have seen it, and they want to do the product anyway.

13     64.     The value of an outside inventor's ideas can be found in any aspect of a
14  submission - a marketing opportunity, play feature, packaging device, collectability
15  premise, market research, previously unknown combination of known elements,
16  non-trivial improvement, empirical trend or focus group research, "looks like-works
17  like model"  --  any information of value previously unknown to the toy company.

18                                        **VII.**
19                    **THE PARTIES' COURSE OF DEALING**
20     65.     On November 2, 2012, Phil Sage of Hasbro introduced Shapiro over
21  email to Wayne Luther, Hasbro's Senior Director of Global Acquisitions and
22  Director of Inventor Relations.
23     66.     Sage's introductory email disclosed that Hasbro recognized Shapiro as
24  a proven expert in girls toys and that the areas in which Hasbro was seeking
25  inventor submission were, *inter alia*:

26
          "2. LPS [Littlest Pet Shop]: Animation new on the Hub, Want excitement,
27        new surprises, low cost innovative feature[s] in pets, never been seen
          mechanisms.
28

LISA BORODKIN
ATTORNEY AT
LAW

 3. Pony [My Little Pony]: Focus on hair, materials, styling innovation .. New ways to play[.]

4. Fashion dolls in general, a line or segment of product .. Not an item. Newest and hottest girls trends."

67.     On or about April 9, 2013, Hasbro and Shapiro signed the AHC.

68.     On April 25, 2013, Shapiro met with Wayne Luther, Mike Gray and Dougal Grimes of Hasbro at the Doubletree Hotel in Santa Monica, California and presented the Wishables Submission and two other inventions.

69.     Gray and Grimes work in Games, not Girls.

70.     Luther, Gray and Grimes did not stop Shapiro's presentation of the Wishables at the April 25, 2013 meeting to say Hasbro was developing a product "in house" of a line of totally clear animal characters filled with liquid and themed glitter, or a line of totally clear animal characters with a light-up feature.

71.     Grimes filled out an Inventor Review Record of Shapiro's inventions on his iPad, had Shapiro and Luther sign it, and emailed it to Shapiro using a gmail address, "inventorfriendly@gmail.com."

72.     Unknown to Shapiro, an engineer at Hasbro Far East Ltd. ("HFE"), also at that time had the password to "inventorfriendly@gmail.com."

73.     Hasbro's entire Concept Acquisition Group and interns also had the password to "inventorfriendly@gmail.com."

74.     Hasbro stored Inventor Review Records containing the ideas of Shapiro and other inventors in "inventorfriendly@gmail.com" from 2013 to 2016.

75.     At the end of the April 25, 2013 meeting, Luther asked Shapiro to send in her physical materials on all three inventions (including Wishables) to Rhode Island, and to upload her slideshow using Signiant Media Exchange.

76.     Luther told Shapiro he was taking in her concepts for possible use with Littlest Pet Shop and My Little Pony.

77.  Shapiro is informed by Hasbro, and thereon alleges, that Hasbro has not licensed any inventor concepts for Littlest Pet Shop in the past 10 years.

78.  On May 1, 2013, Shapiro FedExed her sculptures (including the working, light-up deluxe $9.99-$10.99 model and the Littlest Pet Shop model) to Hasbro and uploaded her Wishables slideshow to Signiant Media Exchange.

79.  Hasbro had exclusive possession of Shapiro's light-up Wishables deluxe model, packaging mockup, Littlest Pet Shop and original character models until July 25, 2013 and never claimed to have destroyed or returned the Wishables slideshow.

80.  Hasbro showed the Wishables slideshow and models to Hasbro's Director of My Little Pony, the Vice President of Girls Toys, and the Vice President of Girls Brands at a June 5, 2013 First Idea Review meeting.

81.  Shapiro is informed and thereon believes that an untold number of HFE engineers in Hong Kong, interns, and Concept Acquisition personnel had access to the "inventorfriendly@gmail.com" account that contained SHapiro's INventor Review Record.

82.  Hasbro's Director of My Little Pony, Vice President of Girls Toys, and the Vice President of Girls Brands who saw Wishables at the June 5, 2013 First Idea Review direct the work of the designer who Hasbro claims is the designer of My Little Pony Rainbow Shimmer, Water Cuties and Sparkle Brights.

83.  On July 25, 2013 (3 months after first seeing Wishables), Hasbro emailed Shapiro that it was declining to licences Wishables, stating "Pass: Not right for current direction in pet shop." Hasbro also passed on the invention it took for My Little Pony.

84.  Hasbro did not at any time prior to 2016 disclose to Shapiro that it was working on any totally clear light up doll lines.

85.  Thereafter, in August 2014, Hasbro invited Shapiro to a recruiting

1   event in Los Angeles, California.

2       86.     In August 2014, Hasbro asked Shapiro to submit her resume and

3   portfolio of work for potential full-time employment with Hasbro.

4                                    **VIII.**

5       **HASBRO'S USE OF SHAPIRO'S TRADE SECRET INFORMATION**

6       87.     About 17 months after first seeing Wishables, Hasbro commercially

7   released a new segment in its My Little Pony brand of totally clear, animal-shaped

8   dolls, filled with liquid and glitter shaped to match each character, at the $5.99-

9   $7.99 opening price point, called Rainbow Shimmer in Fall 2014 ("Rainbow

10  Shimmer"), just as recommended in the Wishables marketing roadmap.

11      88.     Hasbro commercially released a follow-up segment of totally clear,

12  animal-shaped dolls, filled with liquid and glitter shaped to match each character as

13  Cutie Mark Magic Water Cuties in 2015 and Spring 2016 ("Water Cuties"), just as

14  recommended in the Wishables marketing roadmap.

15      89.     Shapiro is informed and believes that Hasbro, in October 2014, had

16  made drawings proposing to release yet more Water Cuties characters in Fall 2016,

17  just as recommended in the Wishables roadmap. Hasbro abandoned its plans to

18  release more Water Cuties in Fall 2016 after Shapiro contacted Hasbro with her

19  claims of misappropriation in late 2014.

20      90.     Hasbro has or will imminently release a line of deluxe, totally clear

21  animal-shaped characters with a light-up feature at the $9.99 price slot in the My

22  Little Pony brand as Sparkle Bright ("Sparkle Bright"), just as recommended in the

23  Wishables marketing roadmap.

24      91.     Hasbro's purported designer of Sparkle Bright is the same designer that

25  Hasbro claims designed Rainbow Shimmer and Water Cuties. She reports to three

26  people who saw Wishables.

27      92.     Shapiro is informed and believes and thereupon alleges that Hasbro

LISA BORODKIN
ATTORNEY AT
LAW

28

COMPLAINT AND DEMAND FOR JURY TRIAL

1  took design, invention, marketing, sales, focus group and trend research information

2  from the Wishables Submission that had independent value from not being generally

3  known, and used it to release, improve or develop the Rainbow Shimmer, Water

4  Cuties, and Sparkle Bright lines.

5        93.    Shapiro is informed and believes and thereupon alleges that Hasbro

6  was not aware – prior to receiving the Wishables Submission – that (1) a line of

7  dolls at the opening price point of $5.99-$7.99 could be established with totally

8  clear, animal-shaped dolls filled with liquid and character-themed glitter, and (2) the

9  line of totally clear animal dolls could be extended for years and seasons by doing a

10  deluxe line at the $9.99-$10.99 price point with totally clear bodies with a light-up

11  feature.

12                    **FIRST CAUSE OF ACTION**

13              **(Misappropriation of Trade Secrets in Violation of**

14              **Defend Trade Secrets Act, 18 U.S.C. § 1836)**

15        94.    Shapiro re-alleges paragraphs 1 through 93, as if fully set forth herein

16        95.    Shapiro's trade secret information relates to products used in, or

17  intended for use in, interstate or foreign commerce.

18        96.    Hasbro acquired, disclosed, or used Shapiro's trade secrets through

19  improper means, namely by breach of the AHC, storage and transmission through

20  "inventor friendly@gmail.com," and retaining the Wishables slideshow for years

21  after rejecting the Wishablse invention.

22        97.    Shapiro owned trade secrets, namely information, including a formula,

23  pattern, compilation, program, device, method, technique, or process, that derives

24  independent economic value, actual or potential, from not being generally known to

25  the public or to other persons who can obtain economic value from its disclosure or

26  use.

27        98.    In addition, the Wishables Submission as a whole was a trade secret as

28

LISA BORODKIN
ATTORNEY AT
LAW

an effective, successful and valuable integration of public domain elements and the aforesaid trade secrets that had independent economic value and was protected from misappropriation (*see Altavion, Inc. v. Konica Minolta Sys. Lab. Inc.,* 226 Cal. App. 4th 26, 47, 171 Cal. Rptr. 3d 714, 731 (2014), *review denied* (Aug. 20, 2014)) as a "road map" to the "how" and "why" to sell the toy line, and the combination of elements in the Phase 1 and Deluxe doll lines.

99.     Shapiro is informed and believes and thereupon alleges that the trade secrets in and of the Wishables Submission contributed to the final design iteration, packaging, positioning, sales rationale and/or marketing of My LIttle Pony Sparkle Brights as commercially released.

100.   Shapiro's trade secrets were the subject of efforts that were reasonable under the circumstances to maintain their secrecy, including that Shapiro required recipients to sign a Nondisclosure Agreement; Shapiro developed the information in secret; that Shapiro stored tangible materials in locked rooms and digital assets on password-protected computers; Shapiro labeled the Wishables slideshow "Confidential" on every page.

101.   Shapiro is informed and believes and thereon alleges that Hasbro's acts of misappropriation of Shapiro's confidential information on or after May 11, 2016 include:

102.   Distributing Sparkle Bright Wave 1 and Wave 2 for sale in the $9.99 price slot for August 1, 2016 and October 1, 2016 in interstate commerce.

103.   Shipping Sparkle Bright toys to Singapore for sale on or about June 15, 2016

104.   Shipping Sparkle Bright toys from Hasbro's factory in Asia to other territories for sale after May 11, 2016.

105.   Shapiro is informed and believes and thereon alleges that Hasbro misappropriated her trade secret willfully and maliciously, entitling her to an award

LISA BORODKIN
ATTORNEY AT
LAW

COMPLAINT AND DEMAND FOR JURY TRIAL

1   of exemplary damages in an amount two times the amount of her actual loss or a

2   reasonable royalty, pursuant to 18 U.S.C. § 1836(b)(3)(C).

3      106.   Shapiro is entitled to a temporary restraining order, preliminary and

4   permanent injunction restraining the sale of Sparkle Brights pursuant to 18 U.S.C. §

5   1836(b)(3)(A).

6      107.   If sales of Sparkle Bright are not restrained, Shapiro is entitled to a

7   mandatory injunction to give her a package credit under 18 U.S.C. §

8   1836(b)(3)(A)(ii).

9                    **SECOND CAUSE OF ACTION**

10             **(Misappropriation of Trade Secrets in Violation of**

11   **California Uniform Trade Secrets Act, Cal. Civ. Code § 3426 *et seq.*)**

12      108.   Shapiro re-alleges paragraphs 1 to 107 as if fully set forth herein.

13      109.   Hasbro acquired, disclosed, or used Shapiro's trade secrets through

14   improper means, namely by breach of the AHC, and transmission through "inventor

15   friendly@gmail.com," and retaining the Wishables slideshow for years after

16   rejecting it.

17      110.   Shapiro owned trade secrets information, including a formula, pattern,

18   compilation, program, device, method, technique, or process, that derives

19   independent economic value, actual or potential, from not being generally known to

20   the public or to other persons who can obtain economic value from its disclosure or

21   use.

22      111.   In addition, the Wishables Submission as a whole was a trade secret as

23   an effective, successful and valuable integration of public domain elements and the

24   aforesaid trade secrets that had independent economic value and was protected from

25   misappropriation (*see Altavion, Inc. v. Konica Minolta Sys. Lab. Inc.,* 226 Cal. App.

26   4th 26, 47, 171 Cal. Rptr. 3d 714, 731 (2014), *review denied* (Aug. 20, 2014)) as a

27   "road map" to the "how" and "why" to sell the toy line, and the combination of

28

LISA BORODKIN
ATTORNEY AT
LAW

COMPLAINT AND DEMAND FOR JURY TRIAL

1  elements in the Phase 1 and Deluxe doll lines.

2      112.   Shapiro is informed and believes and thereupon alleges that the trade

3  secrets in and of the Wishables Submission contributed to the final design iteration,

4  packaging, positioning, sales rationale and/or marketing of My LIttle Pony Sparkle

5  Brights as commercially released.

6      113.   Shapiro's trade secrets were the subject of efforts that were reasonable

7  under the circumstances to maintain their secrecy, including that Shapiro required

8  recipients to sign a Nondisclosure Agreement; Shapiro developed the information in

9  secret; that Shapiro stored tangible materials in locked rooms and digital assets on

10  password-protected computers; Shapiro labeled the Wishables slideshow

11  "Confidential" on every page.

12      114.   Shapiro is informed and believes and thereon alleges that Hasbro

13  misappropriated her trade secret willfully and maliciously, entitling her to an award

14  of exemplary damages in an amount two times the amount of her actual loss or a

15  reasonable royalty, pursuant to Cal. Civ. Code § 3426.3.

16      115.   Shapiro is entitled to a temporary restraining order, preliminary and

17  permanent injunction restraining threatened misappropriation of her trade secrets

18  through the sale of Sparkle Brights pursuant to Cal. Civ. Code § 3426.2(a).

19      116.   If sales of Sparkle Bright are not restrained, Shapiro is entitled to a

20  mandatory injunction to give her a package credit under Cal. Civ. Code § 3426.2(c).

21                          **THIRD CAUSE OF ACTION**

22                      **(Breach of Express Written Contract)**

23      117.   Shapiro re-alleges paragraphs 1 through 116, as if fully set forth herein.

24      118.   On or about April 9, 2013, Shapiro and Hasbro entered into the written

25  AHC.

26      119.   On or about April 25, 3013, Shapiro first disclosed information

27  comprising the Wishables Submission to Hasbro under the written AHC.

LISA BORODKIN
ATTORNEY AT
LAW

28

COMPLAINT AND DEMAND FOR JURY TRIAL

120.   In reliance on and in consideration of the AHC, Shapiro shared confidential and proprietary information comprising the Wishables Submission with Hasbro, including by providing Hasbro exclusive access for three months to Shapiro's unpublished sculptures, access to Shapiro's unpublished slideshow, and Shapiro's confidential, in-person demonstration.

121.   Shapiro fully performed all conditions and obligations required of her under the AHC, including but not limited to labeling all confidential information thereunder "CONFIDENTIAL."

122.   Hasbro materially breached the AHC by the acts alleged above, including, *inter alia*, using confidential information in the Wishables Submission previously unknown to Hasbro in the Accused Toys.

123.   Hasbro has not paid Shapiro for using the information acquired under the AHC that was previously unknown to Hasbro, although Hasbro initiated the transfer of information, Shapiro's information was directly responsive to Hasbro's November 2, 2012 email, and it is Shapiro's livelihood to create such information.

124.   Shapiro is informed and believes and thereupon alleges that she has been damaged by Hasbro's material breach of the AHC, in an amount unknown but exceeding at least $75,000.00.

## FOURTH CAUSE OF ACTION

### (Breach of Implied Covenant of Good Faith and Fair Dealing)

125.   Shapiro re-alleges paragraphs 1 through 124, as if fully set forth herein.

126.   Shapiro and Hasbro entered into a contract, namely the AHC.

127.   Shapiro fulfilled her obligations under the AHC.

128.   Any conditions precedent to Hasbro's performance of the AHC have occurred.

129.   Hasbro unfairly interfered with Shapiro's rights to receive the benefits of the AHC.

LISA BORODKIN
ATTORNEY AT
LAW

20

130.   Shapiro was harmed by Hasbro's conduct in an amount unknown but believed to exceed Seventy-Five Thousand Dollars ($75,000.00).

WHEREFORE, Plaintiff Shapiro prays as follows:

A.     For an award of damages in an amount to be proven at trial of at least Seventy-Five Thousand Dollars ($75,000.00);

B.     For an award of damages in at least the amount of a reasonable toy royalty;

C.     For restitution or disgorgement of all revenue Hasbro obtained by its inequitable conduct;

D.     For an award of the amounts that Hasbro has unjustly enriched itself caused by misappropriation of Shapiro's trade secrets that is not taken into account in computing damages for actual loss;

E.     For an award of exemplary damages in an additional amount not exceeding two times the award under Paragraphs B, C and D above;

F.     For an injunction prohibiting the continued sale of the Accused Toys in any territory or by any party within the jurisdiction of this Court;

G.     For a mandatory injunction under 18 U.S.C. § 1836(b)(3)(A)(ii) and Cal. Civil Code 3426.2(c) requiring Defendant to sticker the Sparkle Bright toys "under license from" Plaintiff and giving Plaintiff a credit on packaging;

H.     For interest running from the date of the original complaint on non-contract causes of action; and

I.     For such other and further relief as the Court may deem proper.

1 | DATED:      August 2, 2016          Respectfully submitted,

2 | LISA BORODKIN, ATTORNEY AT LAW

3 |

4 |

5 | By: _____/s/ Lisa J. Borodkin_____

6 |                    LISA J. BORODKIN

7 | KING, HOLMES, PATERNO & SORIANO
    LLP
8 |

9 | Attorneys for Plaintiff ELINOR SHAPIRO

10 |

11 |

12 |

13 |

14 |

15 |

16 |

17 |

18 |

19 |

20 |

21 |

22 |

23 |

24 |

25 |

26 |

27 |

LISA BORODKIN
ATTORNEY AT
LAW
28 |

COMPLAINT AND DEMAND FOR JURY TRIAL

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a jury trial as provided by Rule 38(a) of the Federal Rules of Civil Procedure.

DATED:      August 2, 2016      Respectfully submitted,

LISA BORODKIN, ATTORNEY AT LAW

By:        */s/ Lisa J. Borodkin*

LISA J. BORODKIN

KING, HOLMES, PATERNO & SORIANO LLP

Attorneys for Plaintiff ELINOR SHAPIRO